**James BAKER, Plaintiff,**

v.

**Edward BLANCHETTE, Defendant.**

**No. 3:99CV548(RNC)(DFM).**

United States District Court,
D. Connecticut.

Sept. 12, 2001.

James F. Byrne, James R. Byrne, Elizabeth K. Andrews, Tyler Cooper & Alcorn, Hartford, CT, for James Baker, plaintiff.

Richard T. Couture, Attorney General's Office, Public Safety & Special Revenue, Hartford, CT, for Edward Blanchette, Clyde McDonald, defendants.

## RULING AND ORDER

CHATIGNY, District Judge.

Plaintiff James Baker, a Connecticut inmate, brings this action pursuant to 42 U.S.C. § 1983 against Edward Blanchette, M.D., the Director of Professional and Clinical Services for the State of Connecticut Department of Correction ("DOC"). The plaintiff claims that the defendant was deliberately indifferent to his need for a surgical procedure and delayed the procedure for financial reasons in violation of the Eighth and Fourteenth Amendments. The defendant has moved for summary judgment arguing that no reasonable jury could find a constitutional violation in this case because the plaintiff's need for the surgery was not urgent and the plaintiff suffered no pain or serious harm as a result of the delay. The defendant also argues that he is entitled to have the case dismissed based on the defense of qualified immunity because it was objectively reasonable for him to think that the surgery could be postponed without violating the plaintiff's constitutional rights. For the reasons that follow, the defendant's motion is denied and the Clerk is ordered to obtain pro bono counsel for the plaintiff.

*Facts*

The pleadings, Local Rule 9 statements, affidavits and documentary evidence submitted by the parties, viewed in a light most favorable to the plaintiff, would permit a reasonable jury to find the following facts.

In March 1994, the plaintiff underwent a colostomy procedure at Yale New Haven Hospital following a gunshot wound to his thigh and rectum. A colostomy is a surgical connection of the large intestine to the body surface at the abdominal wall to al-

low for passage of waste into a bag. In cases involving traumatic injury to the colon, a temporary colostomy may be "closed" or "reversed" after the colon has been given time to heal. The surgeons who performed the plaintiff's colostomy procedure anticipated that he would return to the hospital to have the colostomy closed in about six months.

On May 2, 1994, the plaintiff was placed in the custody of the DOC to begin serving a sentence of less than one year. On May 17, 1994, he was arraigned in state court on murder charges and bond was set at $250,000.

On May 26, 1994, the plaintiff was transported to Yale New Haven Hospital for a follow up visit. At that time, he was doing well and had no complaints. He was scheduled to be seen three months later for preoperative procedures in connection with closure of the colostomy, which was planned for September.

On May 27, 1994, a physician at the New Haven Correctional Center submitted a request to the DOC Managed Health Care Utilization Review Committee ("URC") seeking authorization for closure of the plaintiff's colostomy. The URC denied the request citing lack of supporting medical information. The URC stated that a letter was needed from the plaintiff's surgeon regarding when the closure had to be done.

On June 20, 1994, a nurse at the New Haven Correctional Center communicated with Dr. Burns at Yale New Haven Hospital regarding the URC's request for more information. The nurse left a message for Dr. Burns asking whether the closure needed to be done immediately. Dr. Burns' office replied that the closure should be done in September or October. The nurse followed up by asking whether the closure could be postponed until January 1995, when the plaintiff would be com-

pleting his sentence of less than one year. Dr. Burns' office replied that January 1995 was "ok" with him.

On October 15, 1994, the plaintiff was transferred to the Connecticut Correctional Institution at Cheshire. The following week, the plaintiff complained about bleeding and pain at the colostomy site, which was examined and found to have some bleeding and a yellowish discharge. Medical personnel noted that the plaintiff's request for a colostomy closure had been denied by the URC, apparently because of his anticipated release date of January 1995, but that he had charges pending against him and might not be released in January.

On January 27, 1995, the plaintiff was transferred back to the New Haven Correctional Center. Three days later, he completed serving his sentence of less than one year. However, he was detained in DOC custody on the pending murder charges because he was unable to meet the $250,000 bond.

On February 24, 1995, a physician's assistant at the New Haven Correctional Center submitted a request to the URC seeking authorization to make arrangements for closing the plaintiff's colostomy. In March 1995, before the URC acted on that request, an unidentified medical consultant reported that there was no urgency and that the closure could be postponed until the plaintiff got out of prison. The defendant became involved in the plaintiff's treatment at about this time.

On August 24, 1995, plaintiff was transferred to another DOC facility. Within a week of his arrival there, another request was submitted to the URC seeking approval of a colostomy closure. The request stated: "Had colostomy following [gunshot wound] in 3/94. Has been moved from facility to facility. URC didn't approve in late 1994 because of pending discharge which didn't happen." On Septem-

ber 6, 1995, the request was approved on the condition that no court dates be pending within three months of the surgical procedure.

On September 29, 1995, the plaintiff was examined at St. Francis Hospital in connection with the anticipated surgery, which was going to be performed there. The examination revealed that the plaintiff had developed a parastomal hernia, which is a common occurrence after a colostomy.

In October 1995, the plaintiff returned to St. Francis Hospital in preparation for a colostomy closure and hernia repair. Before the surgery could be performed, he was ordered to appear in court in connection with the pending murder charges. Accordingly, the surgery was postponed.

On November 29, 1995, the plaintiff was convicted on the murder charges and his bond was increased to $500,000. On January 12, 1996, he was sentenced to a total effective sentence of 50 years.

On March 14, 1996, a request was submitted to the URC seeking approval of a surgical consult for the plaintiff. The request noted that the plaintiff had been scheduled for surgery at St. Francis Hospital in October 1995 but that the plaintiff had been "moved about" and was now a sentenced prisoner. On March 28, 1996, the request was denied by the URC on the ground that it involved a pre-existing condition. On April 2, 1996, this denial was discussed with the defendant, who said he would have it discussed again at the URC. *See* Def.'s Affidavit, Ex. A–1, Clinical Record, 4/2/96.

On April 9, 1996, a nursing supervisor sent a memorandum to the defendant asking for reconsideration of the URC denial. The memorandum pointed out that the cost of providing the plaintiff with colostomy bags would be "$23.51 per week × 52

weeks × 50 years" and stated that this would be "very, very expensive."

On May 21, 1996, the defendant submitted a request to the URC seeking approval of a colostomy closure and hernia repair. The request noted that this surgery had been approved before but that the plaintiff had been "moved about and on trial." The defendant's request was approved by the URC that day.

On July 29, 1996, the plaintiff underwent surgery to close the colostomy and repair the hernia. The surgery was completed without complications and the plaintiff was discharged from the hospital on August 3, 1996.

The plaintiff never indicated to the defendant or anyone else that he wanted to delay the colostomy closure. His colostomy bag emitted a foul odor even when properly maintained and he had to change it every two or three days. The hernia caused him some pain, which increased when he tried to engage in certain activities.

*Discussion*

To establish an Eighth Amendment claim based on denial of adequate medical care, a prisoner must prove "deliberate indifference to [his] serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). A serious medical condition exists when failure to treat the condition could result in further significant injury or unnecessary infliction of pain or suffering. *See Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998). Deliberate indifference exists when a prison official knows that the prisoner faces a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it. *Harrison v. Barkley*, 219 F.3d 132, 137–38 (2d

Cir.2000). Under this standard, as under § 1983 generally, a prison official cannot be held liable unless he was personally involved in the violation of the inmate's rights. *See Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir.1997).

The parties appear to agree that the plaintiff's temporary colostomy created a serious medical condition within the meaning of *Gamble*. Factors that have been considered in determining whether a condition is sufficiently serious to provide a basis for an Eighth Amendment claim include whether the condition if untreated could deteriorate or degenerate and thus lead to further injury, whether failure to treat the condition could cause unnecessary infliction of pain or suffering, and whether the condition significantly affects the inmate's ability to engage in normal activities. *See Chance*, 143 F.3d at 702–03; *Koehl v. Dalsheim*, 85 F.3d 86, 88 (2d Cir.1996). Viewing the evidence in a manner most favorable to the plaintiff, a reasonable jury could find that his colostomy constituted a serious medical condition because (1) the colostomy prevented him from eliminating waste in a normal manner; (2) the colostomy required him to wear a bag that constantly emitted a foul odor; and (3) the colostomy required significant maintenance by the plaintiff and medical personnel. "Though these consequences do not inevitably entail pain, they adequately meet the test of 'suffering' that *Gamble* recognized is inconsistent with 'contemporary standards of decency.'" *Koehl*, 85 F.3d at 88 (citing *Gamble*, 429 U.S. at 103, 97 S.Ct. 285).[1]

Turning to the issue of deliberate indifference, analysis of this issue is aided by dividing the chronology of events into three parts: the first covering the plain-

---

1. A jury could also find that failure to close the colostomy could lead to the development of a hernia, which, in turn, could produce pain and affect the plaintiff's ability to engage in normal activities.

tiff's service of his sentence of less than one year; the second covering the time he was held as a pretrial detainee; and the third covering the time between his sentencing on the murder charges and the performance of the surgery six months later.

With regard to the first of these three time periods, there is no evidence that the defendant was personally involved in the plaintiff's treatment, or even knew about his colostomy, until early 1995, after the plaintiff had served his sentence of less than one year and was being detained in connection with the murder charges. The defendant has stated that he is "familiar with the plaintiff . . ., having reviewed his entire medical file and having personally consulted with DOC medical staff in 1995–96 regarding his medical condition and the timing of the surgical reversal of his colostomy." Def.'s Affidavit, para. 13. The plaintiff does not contend, or offer any evidence, that the defendant was involved in, or knew about, his treatment at an earlier time. Accordingly, a reasonable jury could not find that the defendant was deliberately indifferent to the plaintiff's medical needs during the time he was serving his sentence of less than one year.

■ Turning to the second period of time, during which the plaintiff was being held in DOC custody as a pretrial detainee, the defendant contends that he postponed the plaintiff's colostomy closure with the concurrence of the plaintiff's surgeons at Yale New Haven Hospital because it was unclear how long the plaintiff was going to remain in DOC custody. See Def.'s Local Rule 9(c)(1) Statement, paras. 17–19. The plaintiff has denied those assertions without explanation or citation to any evidence. See Pl.'s Local Rule 9(c)(2) Statement, paras. 17–19. However, he has admitted the defendant's closely related assertions that "[as time went on and the severity of [the plaintiff's] charges became known, there seemed to be a strong likelihood that [the plaintiff] would be remaining in DOC custody for a long enough period of time to insure the ability to provide proper pre and post surgical evaluation and care,]" whereupon "the [URC] approved the colostomy reversal with the appropriate stipulation that there be no pending court dates for a period of three months following the surgery." See Def.'s Local Rule 9(c)(1) Statement, para. 20, and Pl.'s Local Rule 9(C)(2) Statement, para. 20. Given those undisputed assertions, a reasonable jury could not find that the initial delay in scheduling the surgery while the plaintiff was held as a pretrial detainee was due to the defendant's deliberate indifference.[2]

It is undisputed that the plaintiff was scheduled for surgery in the fall of 1995 (when his parastomal hernia was discovered in the course of pre-op procedures) and that the surgery was postponed only because he had to appear in court on the murder charges. The plaintiff has not denied the defendant's assertion that it was "appropriate" for the URC to condition its approval of the surgery on the requirement that there be no pending court dates for a period of three months following the surgery. See Def.'s Local Rule 9(c)(2) Statement, para. 20, and Pl.'s Local Rule 9(c)(2) Statement, para. 20. In view of that admission, a reasonable jury could not find that postponing the surgery until after the murder charges were disposed of was the result of deliberate indifference on the part of the defendant.

■ This brings us to the period after the plaintiff was sentenced on the murder charges. The sentencing took place on

---

**2.** The Third Circuit has indicated that elective surgery for a pretrial detainee's non-acute condition may be deferred for a brief period of time until he has been convicted or released. See *Boring v. Kozakiewicz,* 833 F.2d 468, 473 (3rd Cir.1987).

January 12, 1996. No action was taken to provide the plaintiff with surgical treatment until approximately two months later, at which time a request was submitted to the DOC seeking approval of the surgery. When that request was denied, presumably for financial reasons, the defendant was notified and said he would have it discussed again at the URC. *See* Def.'s Affidavit, Ex. A–1, Clinical Record, 4/2/96. However, the defendant did not submit a request for reconsideration to the URC for approximately two more months, even though he knew the plaintiff's surgery was long overdue. When the request for reconsideration was finally submitted, it was approved immediately. The defendant has offered no explanation for this four month delay in obtaining approval for the surgery, the last two months of which appear to be directly attributable to inaction on his part after the matter had been entrusted to him for follow up. In light of the undisputed fact that the plaintiff was originally supposed to have the colostomy closure in September or October of 1994, a jury could find that this four month delay following the sentencing was excessive and that it was due to deliberate indifference on the part of the defendant. *Cf. Hathaway v. Coughlin*, 37 F.3d 63, 67 (2d Cir. 1994) (jury could infer deliberate indifference from delay of over two years between discovery of broken pins in hip and defendant's request that plaintiff be re-evaluated for surgery).[3]

 To obtain summary judgment based on qualified immunity, the defendant must demonstrate that it was objectively reasonable for him to believe that his conduct did not violate an established constitutional right. *See Harrison*, 219 F.3d at 138. On the plaintiff's version of the facts, which has some evidentiary support, he was denied access to reasonably necessary surgery, not because of medical decision-making involving the use of professional judgment, but solely because of cost. The defendant does not attempt to argue that cost concerns were a legitimate factor in determining the treatment the plaintiff should receive. Nor does he contend that the unexplained delay in obtaining approval for the surgery after the plaintiff was sentenced on the murder charges was objectively reasonable. Accordingly, he has not demonstrated that he is entitled to qualified immunity.[4]

For the foregoing reasons, the motion for summary judgment is hereby denied. Because the plaintiff has a triable claim, the Clerk is hereby directed to take steps to obtain pro bono counsel to represent him.

---

**3.** On this view of the matter, the defendant faces potential liability for damages caused by excessive delay in obtaining approval for the surgery after the sentencing on the murder charges. However, he has no liability for any damages arising from previous delays, including damages relating to the development of the hernia.

**4.** The defendant emphasizes that the surgery was elective in nature. However, classifying surgery as elective does not abrogate a prison's duty to promptly provide treatment necessary to address a serious medical need. *See Delker v. Maass*, 843 F.Supp. 1390, 1394 (D.Or.1994) (and cases cited).